**COUNTRYSIDE OIL COMPANY, INC., Plaintiff**

**v.**

**TRAVELERS INSURANCE COMPANY, Defendant.**

**Civ. No. 95–653.**

United States District Court, D. New Jersey.

Sept. 21, 1995.

Christopher W. Hliboki, Garman & Amdur, Rutherford, NJ, for plaintiff.

James Michael Altieri, Shanley & Fisher, Morristown, NJ, for defendant.

OPINION

CHESLER, United States Magistrate Judge.

## I. *INTRODUCTION*

This matter comes before the Court on the motion of defendant, Travelers Insurance Company, for summary judgment. The parties consented to have this action heard by the undersigned, *see* 28 U.S.C. § 636(c), and all proceedings regarding this matter have been referred to the undersigned for disposition. Oral argument on this motion was heard on June 12, 1995. For the reasons set forth herein, the Court will grant defendant's motion for summary judgment, and will dismiss the above-captioned action in its entirety.

## II. *BACKGROUND*

The gravamen of this action is a dispute over whether defendant, Travelers Insurance Company ("Travelers"), must provide insurance coverage to plaintiff, Countryside Oil Company, Inc., ("Countryside") for losses and expenses arising from the cleanup of an accidental oil spill from one of Countryside's trucks. Subject matter jurisdiction lies in this Court on the basis of diversity of citizenship under 28 U.S.C. § 1332. Plaintiff is a New Jersey corporation, defendant is a Connecticut corporation, and the amount in controversy exceeds $50,000. Complaint at ¶¶ 1–2, 5.

Countryside is engaged in the home fuel oil delivery business. Affidavit of Harold Finch at ¶ 2 ("Finch Aff."). Countryside purchased from Travelers an insurance policy [1], effective from September 12, 1992, to September 12, 1993, which provided coverage for commercial general liability and commercial automobiles. Finch Aff. at ¶ 3; Harry M. Baumgartner Certification, Ex. A ("Baumgartner Certif."). Countryside purchased the policy through Triangle Insurance

Services, Inc. ("Triangle") and remitted the policy premium payments directly to Triangle. Finch Aff. at ¶ 3.

Travelers and Triangle had entered into a "commercial lines agency contract" wherein Triangle was "given the written authority to write Property–Casualty Commercial Lines policies" on behalf of Travelers. Rodgen Aff., Ex. F. The agency agreement provides in relevant part:

2. Except as specifically authorized in writing by the Company, the Agent has no authority to make, alter, vary or discharge any policy contract, to extend the time of repayment of premiums, to waive or extend any policy obligation or condition, to place any advertisement regarding the Company, or to incur any liability on behalf of the Company.

Rodgen Aff., Ex. F. at ¶ I.2.

The policy purchased by Countryside in September of 1992 was a renewal of a policy which was effective from 1991 to 1992.[2] Both policies contained identical provisions dealing with the exclusion of pollution coverage. *Compare* Rodgen Aff., Ex. A (as to 1991–1992 policy) *with* Baumgartner Certif., Ex. A (as to 1992–1993 policy). Section two of the commercial general liability coverage policy contained the following coverage exclusions:

2. Exclusions.

This insurance does not apply to

\* \* \* \* \* \*

f(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time

---

1. The policies submitted to the Court list the insured as "Mt. Vernon Oil Co. & et. al". Finch Aff., Ex. A at 1; Howard Rodgen Affidavit, Ex. A at 1 ("Rodgen Aff."). Since the parties do not dispute that Countryside was a named insured under the policy, the "et. al." reference must include Countryside. *See* Rodgen Aff. at ¶ 2 (re-

ferring to the "Mt. Vernon Oil Co./Countryside Oil Co. account" jointly).

2. It appears that the 1991 to 1992 policy was also a renewal of an earlier policy. Plaintiff's brief at 1.

used by or for any insured or others for the handling, storage, disposal, processing or treatment or waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) Which arises out of "your work" or the work or operations of any contractors or subcontractors who work or worked directly or indirectly on your behalf; or

(e) Which arises out of "your product".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Baumgartner Certif., Ex. A at 3. The commercial automobile policy also contained a pollution exclusion which reads:

B. EXCLUSIONS

This insurance does not apply to any of the following:

\*　　\*　　\*　　\*　　\*　　\*

11. POLLUTION

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That re, or that are contained in any property that is:

1. Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

2. Otherwise in the course of transit by the "insured";

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and wastes. Waste includes materials to be recycled, reconditioned or reclaimed.

Baumgartner Certif., Ex. A at 3–4 of Commercial Auto Form. Moreover, the auto policy defined "covered pollution cost" to exclude

any cost or expense arising out of the actual, alleged or threatened discharge, dispersal seepage, migration, release or escape of pollutants:

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured";

Baumgartner Certif., Ex. A at 9 of Commercial Auto Form.

While the 1991–1992 policy was in effect, Travelers notified Countryside by letter dated July 1, 1992, that a "broadening of coverage for the pollution auto non-cargo exposure has been implemented". Rodgen Aff., Ex. D at 2. The letter warned Countryside that the change effected its renewal policy. Thus, the 1992–1993 commercial auto policy contained an endorsement entitled "New Jersey Changes", which provides in relevant part:

Exclusion 11. POLLUTION, is amended by the addition of the following:

This exclusion does not apply for coverage up to the minimum financial responsibility limits specified in N.J.S.A. 39:6B–1.

N.J.S.A. 39:6B–1 set a $5,000 minimum limit for damage to property in any one accident. Lastly, a provision in the 1991–1992 policy provides, "[t]his policy contains all the agreements between you and us concerning the insurance afforded.... This policy's terms

can be amended or waived only by endorsement issued by us as part of this policy." Rodgen Aff., Ex. a at 1.

According to Harold Finch, president of Countryside, in November of 1992 he contacted Norman Feld of Triangle to determine whether the policy issued by Travelers provided coverage for sudden ·and accidental discharges of fuel from its trucks. Finch Aff. at ¶ 5. Finch explains that this inquiry was prompted by a customer of Countryside who had questioned whether Countryside had such coverage. Finch Aff. at ¶ 4.

Feld responded by letter dated December 9, 1992, which advised that since the automobile policy "includes the liability exposure for loading and unloading of fees ... the policy provides coverage for sudden and accidental oil spills from your trucks as respects third party liability." Finch Aff. at ¶ 6, Ex.. B. Based on this advise Finch decided not to purchase additional insurance. Finch Aff. at ¶ 7.

On December 28, 1992, a Countryside oil truck accidentally overturned causing approximately 2500 gallons of No. 2 home heating oil to be spilled onto the roadway and adjoining field. Finch Aff. at ¶ 8. Countryside incurred cleanup costs of $105,000 for services rendered by S & M Waste Oil Co. as well as an "enforcement invoice" for $72,553.12 from the New Jersey Department of Environmental Protection.

Countryside submitted both bills to Travelers for payment under the insurance policy. Travelers denied the claim concluding that the insurance policy issued to Countryside did not cover the peril causing the loss. In settlement of the claim, however, Travelers offered to pay $5,000 representing the minimum limit for "damage to property" within N.J.S.A. 39:6B-1. Finch Aff., Ex. D and F.

On December 15, 1994, Countryside filed a complaint in the New Jersey Superior Court—Law Division, Sussex County, seeking a judgment declaring Travelers liable pursuant to the insurance policy issued to Countryside for all cleanup costs resulting from the oil spill. Specifically, the complaint alleges that:

4. On or about December 28, 1992, Plaintiff suffered a loss which claim falls within the terms of the coverage of the policy, namely the accidental spillage of approximately 2,500 gallons of number 2 fuel oil on a roadway and adjoining ballpark ...

\*   \*   \*   \*   \*   \*

6. A controversy exists between the parties concerning the respective rights under the policy as follows:

a. Defendant contends that pursuant to an exclusion provided by the policy, Plaintiff's loss herein is not covered.

b. Plaintiff contends that such loss is not subject to the alleged exclusion, and that the claimed loss is covered by the insurance policy at issue.

7. By reason of the foregoing, Declaratory Judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between the parties in connection with the aforementioned policy.

Complaint at 2. Countryside also filed a separate complaint against Triangle and Norman Feld alleging that they erroneously advised Countryside that the Traveler's policy covered accidental oil spills. Baumgartner Certif., Ex. C.

Travelers removed this action to federal court and now moves for summary judgment contending that Countryside's claim is barred by the pollution exclusion provisions contained in the insurance policy. While conceding that the policy as written does not provide coverage,[3] Countryside argues that summary judgment is inappropriate because material issues of fact exist as to whether

---

**3.** At oral argument on the motion, Countryside's counsel acknowledged that the pollution exclusion was included in the policy at the time it was issued and that as written, the policy does not provide coverage for the loss. It does appear, however, that the 1992–1993 changes discussed on page 478, *supra*, may provide for the $5,000. in minimum coverage called for under N.J.S.A. 39–6B–1. Therefore, although the Court concludes neither plaintiff's estoppel or reformation claim can support a recovery and that plaintiff's contract claim to the extent that it exceeds $5,000. cannot survive, the Court will only grant partial summary judgement to the defendant—ie. to the extent plaintiff seeks recovery in excess of $5,000.

equitable estoppel and reformation apply. Countryside's first estoppel theory is that Travelers is estopped to deny coverage under the policy because it failed adequately inform either Countryside or Triangle of the legal significance of the pollution exclusion and its effect on Countryside's business, and of the existence of a buy back provision that al-, lowed Countryside to purchase pollution coverage. Countryside maintains that it was Travelers who told Triangle that the policy provided coverage for the oil spill. Countryside urges that this conduct warrants reformation of the policy.

Alternatively, Countryside maintains that Travelers is estopped to deny coverage under the policy by reason of a contrary representation made by its agent, Triangle, and relied upon by Countryside. Neither party disputes that Triangle erroneously advised Countryside that the policy in question covered the peril causing the loss. The dispute, however, centers on whether in making that representation Triangle was acting as an agent of Countryside or Travelers.

▮ Travelers responds that Countryside cannot oppose the motion by invoking the doctrines of equitable estoppel and reformation which were not pled in the complaint.[4] If the Court considers the claims, however, Travelers maintains that the doctrines are not applicable as a matter of law.

### III. *Discussion*

▮ The Court may grant summary judgment when, drawing all inferences in favor of the non-moving party, the pleadings, supporting papers, affidavits, and admissions on file, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *see Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (in banc), *cert. dism'd*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The

Court's function is not to weigh the evidence and discern the truth of the matter, but to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *Id.* at 248, 106 S.Ct. at 2510. A fact is material if it influences the outcome of the action under the governing substantive law. *Id.*

▮ The moving party bears the burden of establishing that there are no genuine issues of material fact for trial regardless of who bears the ultimate burden of proof at trial. Where the non-moving party bears the burden of proof at trial, as plaintiff does here, the moving party may satisfy its burden in a motion for summary judgment by showing that the non-moving party has failed to adduce evidence sufficient to establish an essential element which the non-movant would have to prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

▮ Once that burden is met, the non-moving party "may not rest upon the mere allegations" of its complaint to raise a genuine issue of fact, but must submit evidence specifically showing that there is a genuine issue for trial. *Fed.R.Civ.P.* 56(e); *see also J. Filiberto Sanitation, Inc. v. N.J. Dep't of Envtl. Protection*, 857 F.2d 913, 922 (3d Cir. 1988) (noting the traditional rule that once the complaint's allegations are met by defendant's affidavit, reference to the complaint is insufficient to raise a fact issue); *Robin Const. Co. v. United States*, 345 F.2d 610, 614–15 (3d Cir.1965). If the party opposing the motion fails to do so, the "factual record will be taken as presented by the moving party and judgment will be entered as a matter of law." *United States v. Hoboken*, 675 F.Supp. 189, 192 (D.N.J.1987).

---

4. For purposes of the motion, the Court regards Countryside's brief as an application to amend the complaint to add the claims of equitable estoppel and reformation. *See* Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (leave to amend the pleadings should be freely granted).

Because the Court concludes that claims raised in plaintiff's brief fail as a matter of law, the application to amend is denied as futile. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230 (futility of amendment constitutes a basis for denying the application).

## A. Equitable Estoppel

New Jersey law imposes a general duty on the purchaser of insurance to examine the policy and if the terms do not meet his expectation, the insured is "required to notify the company of the inconsistency and of his refusal to accept the policy in the proffered condition." *Bauman v. Royal Indem. Co.*, 36 N.J. 12, 24–25, 174 A.2d 585 (1961); *Martinez v. John Hancock Mutual Life Ins. Co.*, 145 N.J.Super. 301, 310, 367 A.2d 904 (App.Div.1976), *certif. denied*, 74 N.J. 253, 377 A.2d 660 (1977). Some exceptions have been carved out from this rule of general application. First, unless expressly notified of the change in coverage, an insured is permitted to assume that a renewal policy affords the same coverage as the previous policy. *Bauman*, 36 N.J. at 25, 174 A.2d 585. In this case the earlier policy did not provide coverage for accidental oil spills, thus the current policy is no more restrictive than the earlier one, and hence *Bauman* not applicable here. *Compare* Baumgartner Certif., Ex. A; *with* Rodgen Aff. Ex. A. Although lengthy, the policy here is not ambiguous, impossibly complex, nor affirmatively misleading, rendering the holding in *Gerhardt v. Continental Ins. Co.*, 48 N.J. 291, 225 A.2d 328 (1966), inapposite. Here, however, there was an affirmative representation made by Triangle that accidental oil spill coverage was provided by the policy, possibly making the exception recognized in *Harr v. Allstate Ins., Co.*, 54 N.J. 287, 306, 255 A.2d 208 (1969), a case relied on by Countryside, applicable.

"Consideration of the extent of an insured's duty to read an insurance policy is germane to the two theories upon which an insurer's liability can be expanded beyond" what is provided for in the policy itself: equitable estoppel of the insurer to deny coverage and reformation of the policy. *Martinez*, 145 N.J.Super. at 312, 367 A.2d 904. In *Harr*, the New Jersey Supreme Court explained that the cases finding equitable estoppel,

> all proceed on the thesis that where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the in-

ception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere.

*Harr*, 54 N.J. at 305, 255 A.2d 208. Hence, the two elements required for equitable estoppel to apply are: 1) "a misrepresentation as to the fact or extent of coverage, innocent or otherwise, by the insurer or its agent, and (2) reasonable reliance by the insured thereon to his ultimate detriment." *Martinez*, 145 N.J.Super. at 313–14, 367 A.2d 904.

Countryside makes two arguments as to how equitable estoppel applies to this case. First, Countryside maintains that "Travelers' failure to adequately inform its agent [Triangle] of the pollution exclusion when the coverage issue again arose in December, 1992, resulted in Countryside's continued reliance on Triangle's misrepresentation, as Countryside chose not to purchase additional coverage." Plaintiff's brief at 8. Thus, Traveler's own conduct, asserts Countryside, estops it from denying coverage. Second, Countryside maintains that liability should be imputed upon Travelers for the actions of its agent, Triangle. The Court addresses each contention in turn.

Howard Rodgen, the underwriter at Travelers responsible for the Countryside policies, specifically recalls that in December of 1992 he informed Feld from Triangle that the policy issued to Countryside did not provide coverage for sudden and accidental pollution exposure. Rodgen Aff. at ¶ 3. He also advised Feld that a pollution exclusion "buy-back" endorsement was available which would insure against accidental pollution exposure. Rodgen Aff. at ¶ 4. Rodgen confirmed this information by faxing Feld documents which explained the pollution exclusion. Rodgen Aff. at ¶ 9, Ex. E.

There is no evidence in the record before the Court which contradicts Rodgen's version

of events. Countryside relies on a memorandum written by Feld and addressed to Rodgen, dated January 20, 1993,[5] to assert that Travelers erroneously advised Feld that coverage existed under the policy. *See* Plaintiff's brief, Ex. A. The memorandum was prepared when it became apparent that Travelers was going to deny the claim.

■ It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, concurring). A decision on admissibility under Rule 56 is governed by the same standards that apply at trial. Federal Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to admissibility." Hence, before evidence may be admitted, a foundation must be laid "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a).

■ In order for a document to be considered by a court in ruling on a motion for summary judgment, the document "must be authenticated by and attached to an affidavit that meets the requirements of [Fed. R.Rule.P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722 at 58–60 (2d ed. 1983) (footnote omitted); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir.1987). Accordingly, unauthenticated documents may not be relied upon to defeat a motion for summary judgment.

■ Here, the Feld memorandum is attached as an exhibit to plaintiff's brief in opposition to the motion for summary judgment. There is no affidavit laying a foundation for admissibility of that document. Without a proper foundation there is no way for the Court to determine the genuineness of the document, including whether Feld ac-

tually prepared and agrees with what is said in the memorandum. Additionally, as it stands the document is inadmissible hearsay under Fed.R.Evid. 801. Accordingly, the Court cannot consider the document in opposition to the motion.

Absent this memorandum, there is simply no evidence before the Court that Travelers acted in an improper manner upon which Countryside could justifiably rely to its detriment. The letter from Triangle erroneously advising that the policy provided coverage made no reference to Travelers, and thus the misrepresentation at issue here cannot be said to have been made by Travelers. There is no evidence in the record that Travelers misrepresented anything to either Triangle or Countryside. Equitable estoppel cannot be applied without competent evidence that Travelers said, did, or failed to do, something regarding the issue of coverage for sudden pollution exposure upon which Countryside could justifiably rely to its detriment. Hence, the first requirement of equitable estoppel cannot be satisfied as a matter of law.

■ Recognizing the evidentiary problem presented by its attempt to utilize Feld's memo against Travellers, plaintiff alternately argues that Travellers may be held liable based on the theory that Triangle functioned as Travellers' agent in advising plaintiff about the extent of its coverage. It is a basic principle of agency law that the negligence of an employee-agent while acting within the scope of his employment is imputable to the employer-principal, who must answer for it. *Johnson v. MacMillan*, 233 N.J.Super. 56, 61, 558 A.2d 24 (App.Div.1989); *JMB Enterprises v. Atlantic Employers Ins. Co.*, 228 N.J.Super. 610, 617, 550 A.2d 764 (App.Div. 1988). Liability is imputed to the employer, who is the master of the servant, on basis of respondeat superior. *JMB Enterprises*, 228 N.J.Super. at 617, 550 A.2d 764. Thus, in *Harr* the New Jersey Supreme Court applied equitable estoppel to hold the insurer liable for the negligence of its "employee-agent"

---

5. In the memorandum Feld sets forth his recollection of conversations with Rodgen regarding the pollution coverage for oil spills. According to Feld, they "concluded that the insured had the

old [policy] form (non-simplified) and as such coverage was apparently provided for sudden and accidental loss." Plaintiff's brief, Ex. A at 2.

who erroneously advised the insured that coverage existed under the policy. 54 N.J. at 308–10, 255 A.2d 208. The Court assumed that the "agent" was an employee of the insurer because the insurer did not use "independent" agents. *Harr,* 54 N.J. at 293 n. 1, 255 A.2d 208.

By contrast, the actions of a non-employee agent "are not equatable with the actions of the principal in all circumstances and for all purposes as is ordinarily the case when the agent is a servant." *JMB Enterprises,* 228 N.J.Super. at 617, 550 A.2d 764. To be sure, a non-employee agent who contracts to do something for another but who is not their servant in doing the work, "owes a fiduciary duty to his principal and may bind him in respect of contractual obligations." *Id.* at 618, 550 A.2d 764. But the negligence of a non-employee agent is usually not imputable to the principal. *Johnson,* 233 N.J.Super. at 62, 558 A.2d 24.

New Jersey law draws a distinction between insurance agents and insurance brokers. *Compare* N.J.S.A. 17:22A–2(f) (defining insurance agent) *with* N.J.S.A. 17:22A–2(g) (defining insurance broker). The general rule is that the agent acts for the insurer and the broker acts for the insured. The broker/agent status, however, is a hybrid one. "When he acts for the company within the terms of the agreement, he is then acting as its authorized agent in such a manner that his acts are its acts." *Johnson,* 233 N.J.Super. at 62, 558 A.2d 24. On the other hand, when a broker/agent evaluates the needs of a prospective insured, makes recommendations, and attempts to obtain coverage, he acts as the agent of the insured. *Mazur v. Selected Risks Ins. Co.,* 233 N.J.Super. 219, 226, 558 A.2d 508 (App.Div.1989).

Four recent Appellate Division cases have addressed the relationship between an insurer and the broker/agent when the broker breached its duty of care to an insured in some manner. In *Regino v. Aetna Cas. & Sur. Co.,* 200 N.J.Super. 94, 490 A.2d 362 (App.Div.1985), the plaintiff had purchased a front-end loader and called its broker to request that the new machine be added to its policy. *Id.* at 98, 490 A.2d 362. The broker telephoned the defendant insurer and orally bound the coverage. The broker, however, "failed to confirm the oral binder by a written request, and as a result the machine was not added to plaintiff's policy." *Id.* When the machine was stolen, the defendant insurer denied the claim.

In affirming the trial court's judgment in favor of the broker on its claim for indemnification against the insurer, the Appellate Division held, "that because the insurer has failed to demonstrate that it would not have insured the loss had the agent acted properly, it cannot claim that the loss was 'proximately caused by' the agent's negligence." *Regino,* 200 N.J.Super. at 99, 490 A.2d 362. The court concluded "that once the binder was verbally communicated, the company was on notice of its obligation and that notice, moreover, justified reformation since the broker, in performing the binding function, was acting primarily as the company's agent rather than the client's". *Avery v. Arthur E. Armitage Agency,* 242 N.J.Super. 293, 312, 576 A.2d 907 (App.Div.1990) (discussing the *Regino* holding).

The Appellate Division next addressed the broker-agent-insurer relationship in *Johnson,* where the plaintiff's policy omitted underinsured motorist ("UIM") coverage despite it being available at minimum cost. The court quoted extensively from *Rider v. Lynch,* 42 N.J. 465, 476–477, 201 A.2d 561 (1964), the seminal case establishing the duty of care owed by the broker to the public. *Id.* The court found that the broker had committed professional malpractice under *Rider,* by failing to recommend UIM coverage.

The court began its analysis of the indemnification issue by noting that a broker acts as the agent of the insured in placing its client's liability insurance. *Johnson,* 233 N.J.Super. at 60, 558 A.2d 24. In deciding whether the broker's negligence was imputable to the insurer, the court cited to the agency agreement between the broker and the insurer and concluded that "the broker/agent's status is a hybrid one. When he acts for the company within the terms of the agreement, he is then acting as its authorized agent in such a manner that his acts are its acts." *Johnson,* 233 N.J.Super. at 62, 558

A.2d 24. The *Johnson* court distinguished *Regino,* where the negligence of the broker was imputed to the insurer, by holding that the function which was negligently performed by the broker in not recommending UIM coverage "was not one encompassed by the scope of its agency for the company. Rather, it was one involving only its relationship to its client and was the very function to which *Rider* ascribed the duty of acting with 'degree of skill and knowledge' requisite to his calling." *Johnson v. MacMillan,* 233 N.J.Super. 56, 63, 558 A.2d 24 (App.Div. 1989). The court concluded that the broker's "actionable negligence was in failing to recommend a particular available coverage. That act of negligence was not, by application of *respondeat superior,* an act of negligence of" the insurer. *Johnson* 233 N.J.Super. at 63, 558 A.2d 24.

The *Johnson* decision was followed by *Mazur v. Selected Risks Ins. Co.,* 233 N.J.Super. 219, 558 A.2d 508 (App.Div.1989). There, the plaintiff had asked his insurance broker to obtain "full coverage" on a pick up truck. *Mazur,* 233 N.J.Super. at 221, 558 A.2d 508. Because the broker erroneously believed that any medical costs incurred as a result of an accident involving the truck would be covered by his employee's medical insurance, the broker secured a less expensive commercial vehicle insurance policy which did not include personal injury protection ("PIP") coverage. *Id.* When the plaintiff was subsequently involved in an accident involving the truck the insurer denied payment for medical expenses because there was no such coverage. *Id.* The issue on appeal was limited to whether the negligent broker was entitled to indemnification from the insurer, its non-negligent principal. *Id.* In holding that the broker was not entitled to indemnification the court explained that when the broker undertook to evaluate plaintiff's

> insurance needs, make recommendations to him, and ensure acquisition of appropriate coverage, he was acting, not as the authorized agent for any one of the several insurers which he represented, but only for [plaintiff] Mazur. Thus, [the agent/broker] Curtis' actionable negligence was in failing to recommend to Mazur a particular available coverage. That act of negligence was

not, by application of the principle of respondeat superior, an act of negligence which could be imputed to Selective [the insurer].

*Mazur,* 233 N.J.Super. at 226, 558 A.2d 508.

The court went on to justify the result on public policy grounds noting that there is a great potential for collusion between the agent and the insured in cases where insurance was not properly secured. *Id.* at 227, 558 A.2d 508. Indeed, a "rule favoring blanket indemnification would effectively immunize an agent from damages despite his negligence." *Id.*

The Appellate Division analyzed the relationship between the broker and the insurer one last time in *Avery, supra. Avery* involved three consolidated appeals from the award of partial summary judgment in favor the insured and against the insurance brokers, while at the same time dismissing the brokers' claims for indemnification against the insurer. *Avery,* 242 N.J.Super. at 297, 576 A.2d 907. In each case the broker had failed to recommend/sell uninsured ("UM")/UIM coverage up to the limits of the insured's liability coverage. *Id.* at 298, 576 A.2d 907. All three plaintiff's incurred losses which would have been fully covered had they obtained UM/UIM coverage up to the limits of their liability insurance, which they would have done had it been offered.

In holding that the brokers were not entitled to indemnification the court noted the existence of an agency agreement which authorized the broker "to bind and execute contracts on insurance". *Id.* at 313, 576 A.2d 907. Relying on *Johnson* and *Mazur* the court held that if the broker was negligent in failing to advise plaintiffs of the availability of additional optional UM coverage, such negligence was not within the scope of the agency for the insurer. *Id.* "Rather, the negligence arose from [the broker] Armitage's relationship to plaintiffs, its clients." *Id.*

■ Applying these principles to the case at bar leads to the conclusion that, as a matter of law, when Triangle interpreted the policy and advised Countryside that coverage existed, Triangle was acting as an agent of

Countryside. The commercial general liability policy here in question was issued by Travelers with whom Triangle had a "commercial lines agency" agreement. It is not disputed that Triangle was an independent agent, and not an employee-agent, of Travelers. Accordingly, the holding in *Harr, supra*, is not here applicable.

The agency agreement specifically set forth Triangle's limited authority, including writing Property–Casualty Commercial Lines policies" on behalf of Travelers. Rodgen Aff. Ex. F. The agreement did not give Triangle the authority to interpret the policies issued by Travelers. Furthermore, the agency agreement provides in relevant part:

> 2. Except as specifically authorized in writing by the Company, the Agent has no authority to make, alter, vary or discharge any policy contract, to extend the time of repayment of premiums, to waive or extend any policy obligation or condition, to place any advertisement regarding the Company, or to incur any liability on behalf of the Company.

Rodgen Aff. Ex. F. at ¶ I.2.

As written, the policy issued by Travelers does not insure against the peril causing Countryside's loss. Triangle had no express authority to interpret the policy or give Countryside advice as to the coverage provided under the terms of the policy. Thus, when Triangle mistakenly advised Countryside that coverage was provided under the policy it was acting beyond the express terms of the agency agreement.

Moreover, in evaluating Countryside's insurance needs by interpreting its insurance policies, Triangle was acting as an agent of Countryside. Indeed, such counseling has been traditionally done by brokers in furtherance of their relationship with their clients. This is the exact type of function to which the *Rider* court ascribed the duty of acting with "the degree of skill and knowl-

edge requisite to his calling." *Rider*, 42 N.J. at 477, 201 A.2d 561.

Although Travelers had issued an insurance policy to Countryside, Triangle was evaluating Countryside's insurance requirements when it mistakenly determined that Countryside already had insurance for accidental pollution exposure. This negligent act was not within the scope of the agency for Travelers. The Court holds that, as matter of law, when Triangle undertook to evaluate Countryside's insurance needs and negligently interpreted one of Countryside's insurance policies, it was acting as an agent of Countryside.[6]

In short, because Triangle's negligent acts are not imputable to Travelers, there is no basis for applying equitable estoppel. The court adds that Countryside is not without remedy; because the plaintiff has a pending action in state court against Triangle.

### B. Reformation

Generally, reformation "will be granted only where there is mutual mistake or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." *Heake v. Atlantic Cas. Ins.*, 15 N.J. 475, 481, 105 A.2d 526 (1954). "To support reformation, a high order of proof is required. It must be 'clear cogent and convincing' or 'clear and conclusive'." *Millhurst Milling & Drying v. Automobile Ins. Co.*, 31 N.J.Super. 424, 433, 107 A.2d 46 (App.Div.1954).

Countryside contends that Travelers' unconscionable conduct, or the conduct of its agent, Triangle, warrant reformation of the insurance policy. According to Countryside, Travelers' conduct was unconscionable in that "it failed to adequately inform Countryside of the pollution exclusion when Countryside renewed its policy for the 1992–1993 term." Plaintiff's brief at 10. Countryside insists that the earlier policy included cover-

---

6. Apparent authority cannot serve as a means of imputing liability on Travelers. The issue in an apparent authority inquiry, is "whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question." *Mesce v. Automobile Ass'n of New Jersey*, 8 N.J.Super. 130, 135, 73 A.2d 586 (App.Div.1950). Because Triangle was acting as Countryside's agent, Countryside could not have presumed that Triangle was acting as agent for Travelers.

age for sudden and accidental discharges of pollutants from Countryside's trucks. Moreover, Countryside maintains that "Triangle's failure to inform Countryside of the newly included pollution exclusion either at the time of renewal or at the time of Countryside's inquiry was unconscionable." Plaintiff's brief at 12.

Countryside's argument, however, is not supported by the record before the Court. The Court's review of the 1991–1992 and 1992–1993 policies failed to disclose any material differences in the pollution exclusion. The pollution exclusion in both policies are identical, save for the broadening of coverage afforded as a result of legislation which became effective during the earlier policy. Contrary to Countryside's assertion, coverage for pollution exposure was not provided in either policy. Because there was no change in pollution coverage when the policy was renewed, Travelers did not act unconscionably when it did not give Countryside notice that pollution coverage was not provided under the policy. *See Bauman,* 36 N.J. at 25, 174 A.2d 585.

Moreover, for the reasons stated above, Triangle's conduct is not imputable to Travelers. Thus, reformation cannot be based on Triangle's conduct. In short, the Court finds that the record is completely devoid of any evidence which would support the "high remedy of reformation".

### IV. *Conclusion*

For the reasons set forth above, the Court holds that equitable estoppel and reformation are not here applicable and that Travelers is entitled to judgment as a matter of law. Accordingly, Because plaintiff Countryside cannot recover any amount on its claim in excess of the $5,000. minimum specified in the 1992–1993 amendment to the pollution exclusion, partial summary judgement is granted as to all of the plaintiff's claims to the extent that they exceed $5,000.00. An appropriate order shall issue.